**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

_____
:
FIRST PRIORITY EMERGENCY :
VEHICLES, INC., :
:
               Plaintiff, :
   v. :       Case No. 3:18-cv-9805-BRM-DEA
:
:
REV AMBULANCE GROUP ORLANDO, :
INC., d/b/a MCCOY MILLER :
EMERGENCY VEHICLES, MARQUE :
EMERGENCY VEHICLES, and ROAD :
RESCUE EMERGENCY VEHICLES, :
:          **OPINION**
            Defendant. :
_____:

**MARTINOTTI, DISTRICT JUDGE**

Before this Court is a Motion to Dismiss filed by Defendant REV Ambulance Group

Orlando, Inc. d/b/a McCoy Miller Emergency Vehicles, Marque Emergency Vehicles, and Road

Rescue Emergency Vehicles ("REV" or "Defendant") seeking to dismiss Plaintiff First Priority

Emergency Vehicles, Inc.'s ("First Priority" or "Plaintiff") Amended Complaint pursuant to

Federal Rule of Civil Procedure 12(b)(6). (ECF No. 18.) First Priority filed an Opposition to

Defendants' Motion to Dismiss (ECF No. 24.) Also before this Court is First Priority's Cross-

Motion for Leave to Amend its antitrust claims. (ECF No. 25.) REV filed an Opposition to First

Priority's Cross-Motion for Leave to Amend. (ECF No. 30.) Having reviewed the submissions

filed in connection with the motion and having declined to hold oral argument pursuant to

Federal Rule of Civil Procedure 78(b), for the reasons set forth below and for good cause

appearing, Defendant's Motion to Dismiss is **GRANTED IN PART** and **DENIED IN PART** and First Priority's Cross-Motion for Leave to Amend the Amended Complaint is **GRANTED**.

I.    BACKGROUND

A.  **Factual Background**

For the purposes of this Motion to Dismiss, the Court accepts the factual allegations in the Amended Complaint as true and draws all inferences in the light most favorable to the plaintiff. *See Phillips v. Cty. of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008). Furthermore, the Court also considers any "document *integral to or explicitly relied upon* in the complaint." *In re Burlington Coat Factory Secs. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (quoting *Shaw v. Dig. Equip. Corp.*, 82 F.3d 1194, 1220 (1st Cir. 1996)).

First Priority is a New Jersey corporation with its principal place of business in Manchester, New Jersey. (ECF No. 17 ¶ 6.) REV is a Florida corporation with its principal place of business in Florida. (*Id.* ¶ 7.) REV does business under a variety of names, including McCoy Miller Emergency Vehicles ("McCoy Miller"), Marque Emergency Vehicles ("Marque"), Road Rescue Emergency Vehicles ("Road Rescue"), and Wheeled Coach Vehicles ("Wheeled Coach"), among others. (*Id.*)

First Priority "provides a range of expertise that encompasses design, manufacturing, uplifting, service, fleet management and infrastructure installment." (*Id.* ¶ 11.) For over twenty years, First Priority has also sold and serviced new and remounted ambulance vehicles, remounted ambulances, and parts for ambulances. (*Id.* ¶ 12.) There are three "major categories" of ambulance vehicles in the United States: Type I is based upon a heavy truck chassis and is used primarily for advanced life support and rescue work; Type II is a van-based ambulance with few modifications, except for a raised roof; and Type III is a van chassis that has a custom made

rear compartment with the same use as Type I ambulances. (*Id.* ¶ 13.) REV owns seven of the twenty-one Type I, II, and III ambulance brands marketed in the United States and "controls more than 50% of the [United States] market for new ambulances." (*Id.* ¶ 14.)

On September 12, 2002, First Priority entered into a written agreement with Road Rescue, the Road Rescue Dealer Agreement ("RR Agreement"). (*Id.* ¶ 15.) The RR Agreement had a term of one year, expiring on October 1, 2003, and was renewable "for one year periods thereafter by written agreement of both parties at the time of annual review." (*Id.* ¶ 16.) The RR Agreement granted First Priority the right to sell Road Rescue-branded products throughout New Jersey, requiring First Priority to use its "best efforts" to meet or exceed certain sales goals. (*Id.* ¶¶ 16-17.) Specifically, the RR Agreement required First Priority to: aggressively promote, market, and sell the products; use its best efforts to manufacture and deliver Defendant's products; purchase a demonstrator vehicle; establish and maintain a place of business and a sales office in New Jersey; and maintain all applicable licenses and insurance, among other things. (*Id.* ¶ 17.) This relationship has continued "despite the fact the parties have never prepared a formal written renewal of the RR Agreement." (*Id.* ¶ 18.) Additionally, First Priority contends that, on multiple occasions, representatives from First Priority and Road Rescue "discussed their mutual understanding" that First Priority would remain a dealer of Defendant's products so long as it performed adequately and Defendant "would provide [First Priority] a reasonable time to cure the claimed deficiency before terminating the relationship." (*Id.* ¶ 19.)

On October 10, 2010, Road Rescue assigned its rights and obligations under the RR Agreement to Wheeled Coach. (*Id.* ¶ 22.)[1] On March 30, 2011, First Priority and SJC Industries Corporation ("SJ Industries") entered into a Dealer Sales and Service Agreement (the "SJC

---

[1] On or about December 3, 2015, Wheeled Coach changed its name to REV Ambulance Group Orlando, Inc. (ECF No. 17 ¶ 22.)

Agreement") for an ambulance dealership franchise that included the right to sell ambulances in New Jersey. (*Id.* ¶ 24.)[2] On May 8, 2013, SJC Industries assigned its rights and obligations under the SJC Agreement to Wheeled Coach. (*Id.* ¶¶ 26.)[3]

First Priority alleges that REV provided it with "poor quality" vehicles. (*Id.* ¶¶ 28-41.) Specifically, First Priority alleges: in 2012, Brick Township purchased two Marque-branded ambulances from REV but refused delivery because the vehicles "did not meet specifications" thereby requiring Brick Township to purchase vehicles from a competing brand (*id.* ¶ 29); in 2013, a client, Fairview, claimed it was dissatisfied with the ambulance vehicles due to electrical issues (*id.* ¶ 30); in 2013, a client, Hopatcong, was forced to purchase a demonstrator vehicle because of excessive delays in production (*id.* ¶ 31); in 2013, a client experienced an electrical fire in the Road Rescue vehicle and has since refused to purchase REV products (*id.* ¶ 32); in 2013, a client, Beach Haven, "changed its entire fleet from [] Road Rescue to a different brand due to numerous quality issues" (*id.* ¶ 33); between 2012 and 2013, a client, University Hospital, grew dissatisfied due to delays in production and delivery and has since refused to do business with REV (*id.* ¶ 34); a client, Maplewood, refuses to purchase Road Rescue products due to their poor quality (*id.* ¶ 35); clients South Orange, Roxbury, and Lakewood EMS have each grown so dissatisfied with Road Rescue vehicles that they refuse to purchase any products from REV (*id.* ¶¶ 36-38); in 2015, REV refused to honor a warranty with a client, Hightstown, which is now

---

[2] The SJC Agreement includes many similar clauses to the RR Agreement, including First Priority's obligation to actively and effectively sell vehicles, promote the purchase of such vehicles, and maintain an adequate staff and insurance. (ECF No. 17 ¶ 25.)

[3] The Amended Complaint notes that, following the execution of the SJC Agreement, "three of the five ambulance brands [First Priority] sold and serviced were owned by [REV]: (1) Road Rescue; (2) McCoy Miller; and (3) Marque." (ECF No. 17 ¶¶ 27.) First Priority also sold and serviced two other brands of ambulance vehicles, Demers and Braun, which were unaffiliated with REV. (*Id.*)

unlikely to do any further business with REV (*id.* ¶ 39); and between 2016 and 2017, clients Ocean Township and Atlantic Ambulance purchased vehicles that "experienced quality issues" to the extent that each client now refuses to purchase REV products. (*id.* ¶¶ 40-41).

First Priority alleges it made these quality and service issues well known to REV, which subsequently "failed to follow through on correcting the deficiencies." (*Id.* ¶¶ 42-43.) Specifically, on December 21 and 22, 2016, First Priority's Vice President, Ken Clark ("Clark"), e-mailed REV representative Enrique Gimenez ("Gimenez") expressing First Priority's "frustration at REV's conduct in shipping incomplete ambulances of poor quality and its failure to support" First Priority. (*Id.* ¶ 43.) Thereafter, at REV's annual dealer summit in February 2017, REV's Vice President of Marketing and Sales, Scott Barnes ("Barnes"), told Clark that "REV wanted to get its Road Rescue brand in New Jersey back on track," yet provided "no such support." (*Id.* ¶ 44.)

On or about March 28, 2017, during a meeting between First Priority representative Zach Yeager ("Yeager") and REV representative Irina Hot ("Hot"), REV "revealed its plan to limit competition by restricting its dealers' ability to continue to sell ambulances from brands not affiliated" with it. (*Id.* ¶ 46.) Specifically, REV "indicated that it intended to convert all of its dealers of its ambulance brands toward being either 'factory owned' or REV only dealers." (*Id.*) Under this new policy, REV's ambulance dealers would be prohibited from offering products services to clients that were not manufactured by REV. (*Id.*) During this meeting, First Priority "expressed its reluctance to become a REV-exclusive dealer in light of the quality problems its customers had been experiencing." (*Id.* ¶ 47.)

Between April 2016 and November 2017, REV reduced the percentage of its multi-line dealers by 59% – from sixty-nine to thirty-six – whereas it increased the number of factory-

owned and REV-exclusive dealers by twenty-five percent – from 197 to 222. (*Id.* ¶ 47.) By the end of 2017, 86% of REV dealers were either factory-owned or REV-exclusive dealers. (*Id.*)[4]

In a June 30, 2017 letter from Barnes to First Priority's Alex Cherepakhov ("Cherepakhov"), REV terminated its business relationship with First Priority, stating in pertinent part:

> As you know, First Priority is a REV dealer for the McCoy Miller, Marque, and Road Rescue brand of emergency vehicles in the state of New Jersey pursuant to a Retail Sales and Service Agreement between the parties (the "Dealer Agreement and Dealer Relationship"). However, as a result of First Priority's failure to perform in accordance with the Dealer Agreement, this letter shall serve as REV's official notice of termination of the Dealer Agreement and Dealer Relationship effective sixty (60) days from First Priority's receipt.
>
> Pursuant to the Dealer Agreement, First Priority obligated itself to meet its mutually agreed upon sales objectives and has failed to do so. For example, the sales objective for all three brands for fiscal year 2017 was 18 vehicles and First Priority has only sold 1 vehicle thus far. In fiscal year 2015 and 2016, First Priority only sold a total of 5 and 3 vehicles respectively. The inadequacy of these sales numbers are highlighted by the fact that in 2015 and 2016 a comparable dealer sold 40 and 30 vehicles respectively. First Priority's repeated failure to meet its mutually agreed upon sales objective cannot persist. Accordingly, as a result of First Priority's failure to perform in accordance with the requirements outlined in the Dealer Agreement, REV is terminating the Dealer Agreement and Dealer Relationship effective sixty (60) days from receipt of this notice.

(*Id.* ¶ 50.)

Contrary to REV's termination letter, First Priority contends specific sales goals were

---

[4] First Priority further alleges that, in an effort to "economically coerce [it]" and others similarly situated to become "REV only" dealers, REV introduced a new line of "economically" priced Type I and III ambulance vehicles called "Frontline." (*Id.* ¶ 49.) The Frontline ambulances are "priced significantly below the wholesale cost of REV's other similar vehicles and have only been offered to REV only dealers." (*Id.*) Additionally, REV requires its Frontline dealers to sell those vehicles exactly at the MSRP. (*Id.*)

never "mutually agreed upon" and the only discussion of such goals took place in November 2016 "when [REV] intimated that [First Priority] must sell 13 Road Rescue vehicles in 2017." (*Id.* ¶¶ 51-52.)

On August 3, 2017, David Rapaport ("Rapaport"), a First Priority representative, e-mailed Leslie Fischer ("Fischer"), a REV representative, acknowledging receipt of the termination letter and requesting "a schedule of the [number] of vehicles sold by [First Priority] from 2012 to 2016 against the performance target for each year." (*Id.* ¶ 54.) On August 8, 2017, Fischer replied to Rapaport's e-mail attaching data sheets for Marque and McCoy Miller brand ambulances, First Priority's 2017 sales objectives, and First Priority's sales against performance targets. (*Id.* ¶ 55.)

On August 21, 2017, Jeffery Goldstein ("Goldstein"), First Priority's outside counsel, sent a letter to Barnes asserting, among other things: the termination letter is procedurally defective under the New Jersey Fair Practices Act ("NJFPA") because it fails to identify with specificity the particular agreement it claims to be terminating and the grounds for the termination; the termination letter is substantively flawed as the requirements listed in the letter constitute "unreasonable standards of performance;" REV lacks good cause for the termination; REV committed prior breaches to the agreement; REV "manipulated the system" to cause First Priority's alleged breaches; REV has established and enforced the performance objectives in a discriminatory manner; and the NJFPA does not permit a franchisor to terminate a franchise for any reason "other than the franchisee's substantial breach of legitimate current obligations." (*Id.* ¶ 56.) Goldstein further requested that REV agree to extend the termination effective date from sixty to ninety days to "allow the parties to engage in a meaningful discussion about the future of the parties' business." (*Id.*)

Thereafter, on September 14, 2017, Rapaport sent a letter to Barnes claiming that First Priority "objected promptly to [the] wrongful termination" of the agreements and indicating that First Priority "has removed all REV Ambulance brand signs from its facilities and has ceased selling and or servicing REV Ambulance vehicles." (*Id.* ¶ 57.) Rapaport further noted the termination "has inflicted significant costs" on First Priority. (*Id.*) These costs include First Priority's purchase of a Wheeled Coach Van demo vehicle and a Road Rescue Ambulance demo vehicle from REV – for $64,551 and $154,871, respectively – and $221,718 in "incurred floor plan interest," which was continuing to accrue at a rate of $40.18 per day. (*Id.*)

REV did not reply to Rapaport's September 14, 2017 letter. (*Id.* ¶ 58.) On October 5, 2017, Rapaport sent Barnes a second letter, requesting REV take possession of the two demo vehicles and reimburse First Priority for the purchases, and that REV reimburse First Priority for the cost of keeping the vehicles on the floor plan "after the wrongful termination." (*Id.* ¶ 59.) REV repurchased the Wheeled Coach Van demo vehicle but refused to repurchase the Road Rescue Ambulance demo vehicle. (*Id.* ¶ 60.)

### B. Procedural History

On May 29, 2018, First Priority filed a Complaint (the "Complaint") against REV asserting causes of action for violations of the NJFPA, breach of contract and of the implied covenant of good faith and fair dealing, and violations of state and federal antitrust law. (ECF No. 1.) On November 9, 2018, First Priority filed an Amended Complaint (the "Amended Complaint") against REV asserting causes of action for violations of the NJFPA (Count One), breach of contract and of the implied covenant of good faith and fair dealing (Count Two), violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 (Count Five), violations of Section 2 of the Sherman Act, 15 U.S.C. § 2 (Count Six), violations of the Clayton Act, 15 U.S.C. § 14

(Count Eight), violations of New Jersey State Antitrust Laws (Count Nine), and promissory estoppel (Count Ten). (ECF No. 17.)[5]

On November 29, 2018, REV filed a Motion to Dismiss the Amended Complaint. (ECF No. 18.) On January 23, 2019, First Priority filed an Opposition to REV's Motion to Dismiss the Amended Complaint. (ECF No. 24.) On the same date, First Priority filed a Cross-Motion for Leave to Amend the antitrust claims in the Amended Complaint, complete with a Supplemental Proposed Second Amended Complaint with changes highlighted. (ECF No. 25.) On February 4, 2019, REV filed an Opposition to First Priority's Cross-Motion to Amend (ECF No. 29), and on February 13, 2019, First Priority filed a Reply Brief to REV's Opposition to its Cross-Motion to Amend. (ECF No. 30).

## II.  LEGAL STANDARDS

### A.  Rule 12(b)(6) Standard

In deciding a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a district court is "required to accept as true all factual allegations in the complaint and draw all inferences in the facts alleged in the light most favorable to the [plaintiff]." *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008). "[A] complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted).  However, the plaintiff's "obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action." *Id.* (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). A court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan*, 478 U.S. at 286. Instead, assuming the factual allegations in the complaint

---

[5] The Amended Complaint does not include a count three, four, or seven. (ECF No. 17.)

9

are true, those "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for misconduct alleged." *Id.* This "plausibility standard" requires the complaint allege "more than a sheer possibility that a defendant has acted unlawfully," but it "is not akin to a probability requirement.'" *Id.* (quoting *Twombly*, 550 U.S. at 556). "Detailed factual allegations" are not required, but "more than an unadorned, the defendant-harmed-me accusation" must be pled; it must include "factual enhancements" and not just conclusory statements or a recitation of the elements of a cause of action. *Id.* (citing *Twombly*, 550 U.S. at 555, 557).

"Determining whether a complaint states a plausible claim for relief [is] . . . a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)). However, courts are "not compelled to accept 'unsupported conclusions and unwarranted inferences,'" *Baraka v. McGreevey*, 481 F.3d 187, 195 (3d Cir. 2007) (quoting *Schuylkill Energy Res. Inc. v. Pa. Power & Light Co.*, 113 F.3d 405, 417 (3d Cir. 1997)), nor "a legal conclusion couched as a factual allegation." *Papasan*, 478 U.S. at 286.

While, as a general rule, the court may not consider anything beyond the four corners of the complaint on a motion to dismiss pursuant to Rule 12(b)(6), the Third Circuit has held that "a

court may consider certain narrowly defined types of material without converting the motion to dismiss [to one for summary judgment pursuant to Rule 56]." *In re Rockefeller Ctr. Props. Sec. Litig.*, 184 F.3d 280, 287 (3d Cir. 1999). Specifically, courts may consider any "document *integral to or explicitly relied upon* in the complaint." *Burlington Coat Factory*, 114 F.3d at 1426 (quoting *Shaw*, 82 F.3d at 1220).

## B.  Motion to Amend

Amendments of pleadings are governed by Federal Rules of Civil Procedure 15 and 16. A motion to amend a pleading that is filed before the deadline for amendments of pleadings has passed in a Rule 16 Scheduling Order will be governed by Federal Rule of Civil Procedure 15(a) only. Pursuant to Rule 15(a), a "party may amend its pleading only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a).

"The grant or denial of leave to amend is a matter committed to the sound discretion of the district court." *Arab African Int'l Bank v. Epstein*, 10 F.3d 168, 174 (3d Cir. 1993). The Third Circuit has adopted a liberal approach under Rule 15 to the amendment of pleadings to ensure that "a particular claim will be decided on the merits rather than on technicalities." *Dole v. Arco Chem Co.*, 921 F.2d 484, 487 (3d Cir. 1990) (internal citations omitted). The burden is generally on the party opposing the amendment to demonstrate why the amendment should not be permitted. *Foman v. Davis*, 371 U.S. 178, 180 (1962). Leave to amend a pleading may be denied where the court finds: (1) undue delay; (2) undue prejudice to the non-moving party; (3) bad faith or dilatory motive; or (4) futility of amendment. *Shane v. Fauver*, 213 F.3d 113, 115 (3d Cir. 2000).

## III.   DECISION

REV contends First Priority's NJFPA claim should be dismissed because First Priority does not have a license to grant use of REV trademarks, First Priority's antitrust claims should be dismissed for failure to allege a relevant market, First Priority's Sherman Act claims should be dismissed as the alleged conduct is not actionable under the statute, First Priority's breach of contract and implied covenant of good faith claims should be dismissed, and First Priority's promissory estoppel claim fails as a matter of law because express contracts cover the subject matter of the dispute. (ECF No. 18-1 at 8-26.) First Priority argues each of its claims are adequately pled, and in the alternative, requests this Court grant leave to amend the Amended Complaint should it be inclined to grant REV's Motion to Dismiss with respect to the antitrust causes of action. (ECF No. 25-1 at 10-36.) This Court addresses each argument in turn.

### A.  First Priority's NJFPA Claims

Count One of the Amended Complaint alleges a violation of the NJFPA and seeks damages stemming therefrom as well as attorney's fees as allowed by law. (ECF No. 17 ¶¶ 62-84.) "The protections of the NJFPA [] apply only to a 'franchise.'" *Ocean City Express Co., Inc. v. Atlas Van Lines, Inc.*, 194 F. Supp. 3d 314, 322 (D.N.J. 2016). The NJFPA defines a franchise as:

> [A] written agreement for a definite or indefinite period, [1] in which a person grants to another person a license to use a trade name, trade mark, service mark, or related characteristics, and [2] in which there is a community of interest in the marketing of goods or services at wholesale, retail, by lease, agreement, or otherwise.

N.J. Stat. Ann. § 56:10-3a.

"In other words, a franchise under the NJFPA requires the franchisor's grant of a license to the franchisee and a community of interest between the parties in the relevant market." *Atlas*

*Van Lines*, 194 F. Supp. 3d at 322 (citing *Colt Indus., Inc. v. Fidelco Pump & Compressor Corp.*, 844 F.2d 117, 119 (3d Cir. 1988)).

The New Jersey Supreme Court has held that "not every grant of permission to use a trademark in the sale of goods or services is a license within the meaning of the [NJFPA]." *Instructional Sys., Inc. v. Comput. Curriculum Corp.*, 614 A.2d 124, 138 (N.J. 1992). Rather, the "term 'license' as used in the context of the [NJFPA] constitutes a more narrowly-defined type of entitlement." *Id.* at 139. Specifically, the term "license" means "to use as if it is one's *own*" and "implies a proprietary interest." *Id.* (quoting *Finlay & Assocs., Inc. v. Borg-Warner Corp.*, 369 A.2d 541, 549 (N.J. Law. Div. 1976)). "At a minimum, the term 'license' means that the alleges franchisee must use the name of the franchisor 'in such a manner as to create a reasonable belief on the part of the consuming public that there is a connection between the . . . licensor and licensee by which the licensor vouches, as it were, for the activity of the licensee." *Instructional Sys.*, 614 A.2d at 138 (quoting *Neptune T.V. & Appliance Serv., Inc. v. Litton Sys., Inc.*, 462 A.2d 595, 599 (N.J. App. Div. 1983)).

Here, the Amended Complaint does not explicitly allege that any language in either the RR or SJC Agreement creates a trademark right pursuant to the NJFPA. On the contrary, the RR Agreement indicates: (1) First Priority "shall not use the name of Road Rescue or Road Rescue trademarks in its corporate business name;" (2) First Priority shall "purchase and sell all products in its own name, for its own account and at its own risk;" (3) absent prior written approval – which has not been alleged in the Amended Complaint – First Priority may not use Road Rescue trademarks "in any fashion;" and (4) "nothing contained in [the RR Agreement] shall be deemed to create a[] . . . franchise." (RR Agreement (ECF No. 18-3, Ex. A).) Similarly, the SJC Agreement indicates that dealers have the "right to use such trademarks and trade names as

registered by SJC from time to time" but only "with prior written approval of SJC." (SJC Agreement (ECF No. 18-4, Ex. B).)

Rather than maintain the language of the respective agreements create explicit licenses, First Priority contends its "allegations are sufficient to create a reasonable belief on the part of the consuming public that there is a connection between the trade name licensor and licensee by which the licensor vouches." (ECF No. 25-1 at 17.) In support of this contention, First Priority highlights its allegations that: (1) it was listed on REV's website as being an authorized dealer for the McCoy Miller and Road Rescue marks; (2) REV's McCoy Miller and Road Rescue marks were displayed on its website during all applicable times; (3) First Priority used REV's McCoy Miller and Road Rescue marks in its sales literature; and (4) REV's McCoy Miller and Road Rescue marks were displayed on First Priority's headquarters building in New Jersey since 2008. (ECF No. 17 ¶ 66.)

None of First Priority's allegations imply a proprietary interest in REV's trademarks sufficient to determine it held a license pursuant to the NJFPA.[6] Indeed, the relevant case law interpreting the NJFPA compels this conclusion. For instance, in *Finlay*, the Law Division determined that no license existed as, *inter alia*, plaintiff's business did not operate under the name of any alleged franchisor, but used only its own name, and the written agreement itself included "no requirement of economic dependency except to the extent plaintiff by its own choice elected to concentrate on the line of merchandise it preferred for whatever business

---

[6] This conclusion is further supported by the fact that the RR and SJC Agreements explicitly provide that the right to use trademarks and tradenames was subject to prior written approval of the respective contractors and First Priority has failed to allege such written approval was provided. (ECF No. 18-3, Ex. A; ECF No. 18-4, Ex. B.)

reasons." *Finlay*, 369 A.2d at 546.[7] The *Finlay* court further held that the "[m]ere furnishing of advertising materials as contemplated by the [] agreement, and allowing plaintiff to have its name placed on certain items, if it wished, as advertising . . . for their own benefit does not fulfill the letter or intent of the [NJFPA]." *Id.* The court elaborated that an entity's distribution of "advertising materials of another's products . . . or participating in advertising or listing advertisements that certain individuals or businesses sell certain products, is not what is meant by a license" pursuant to the NJFPA. *Id.* Here, First Priority did not operate under any of REV's trademark names and did not allege an exclusive relationship with REV. As in *Finlay*, First Priority merely sold and advertised certain REV products, and as such, its relationship was insufficient to create a franchisor-franchisee license agreement.

Furthermore, the facts in the Appellate Division's holding in *Neptune* are distinguishable and therefore do not provide persuasive support to First Priority's position. Specifically, the *Neptune* plaintiff was designated an "authorized service source" for the defendant, and services it performed were billed directly to and paid by the defendant. *Neptune*, 462 A.2d at 597. Moreover, the plaintiff was "authorized to represent and hold itself out as an authorized [defendant] service source in its advertising, letterheads, calling cards and service vehicle markings" such that plaintiff gave its "imprimatur to [plaintiff]'s business enterprise" and plaintiff's services were quality controlled and endorsed by defendant itself. *Id.* at 598-99. Here, although First Priority alleges that REV's McCoy Miller and Road Rescue marks were displayed

---

[7] Similarly, in *Colt Indus.*, the Third Circuit determined that no license existed because, *inter alia*, the plaintiff had been prohibited from using the defendant's trade name as part of its own. *Colt Indus.*, 844 F.2d at 120. As here, the plaintiff in *Colt Indus.* "could use [defendant's] name only in a limited sense and that [defendant's] brand name could not be used in [plaintiff]'s business name." *Id.* In justifying its holding, the Third Circuit noted that if such an agreement "constitutes a license to use a trademark, then any business selling a brand name product would . . . necessarily be considered as holding a license." *Id.*

on its website and physical headquarters, the relationship did not rise to the level of that in *Neptune* as First Priority was never granted a license and did not have the same level of corporate entanglement as in *Neptune*.[8] Accordingly, REV's Motion to Dismiss Count One is **GRANTED** and Count One is **DISMISSED WITHOUT PREJUDICE**.

### B. First Priority's Antitrust Claims – Relevant Market

REV contends each of First Priority's antitrust claims – Counts Five (15 U.S.C. § 1), Six (15 U.S.C. § 2 – attempt to monopolize), Seven (15 U.S.C. § 2 – monopolization), Eight (15 U.S.C. § 14), and Nine (New Jersey state antitrust violations, N.J. Stat. Ann. § 56:9, *et seq.*) – because First Priority has not met its burden of alleging a relevant market. (ECF No. 18-1 at 14-17.) First Priority argues the allegations in its Amended Complaint satisfy the "reasonable interchangeability" standard and that as such, REV's Motion to Dismiss should be denied.

In antitrust actions, plaintiffs have the "burden of defining the relevant market." *Queen City Pizza v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir. 1997) (citing *Tunis Bros. Co., Inc. v. Ford Motor Co.*, 952 F.2d 715, 726 (3d Cir. 1991)).[9] "The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." *Queen City*, 124 F.3d at 436 (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 375 (1962)). Furthermore, the test for

---

[8] Similarly, this Court is also unpersuaded by First Priority's argument that the holding in *McPeak v. S-L Distribution Co.*, No. 12-348, 2014 WL 4388526 (D.N.J. Sept. 5, 2014) supports a finding that First Priority had a proprietary interest in REV's trademarks. In *McPeak*, the court identified several factors relevant to showing that a proprietary interest in the trademarks were licensed, including, among others, the use of the defendant's marks on business cards, invoices bearing defendant's names and marks, and a representation that plaintiff's salespersons were employees or agents of defendant. *Id.*, at *9. None of these factors apply to First Priority.

[9] Importantly, the Third Circuit has also held that although defining a proper market can be a fact intensive inquiry requiring discovery, *see Eastman Kodak Co. v. Image Tech. Servs, Inc.*, 504 U.S. 451, 482 (1992), there is no "*per se* prohibition against dismissal of antitrust claims for failure to plead a relevant market under Fed. R. Civ. P. 12(b)(6)." *Queen City*, 124 F.3d at 436.

determining interchangeability of use is not "reasonably interchangeable by a particular plaintiff, but 'commodities reasonably interchangeable by consumers for the same purpose.'" *Queen City*, 124 F.3d at 436 (quoting *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 395 (1956)). The relevant market is legally insufficient, and thus dismissal is appropriate, when a plaintiff "fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor." *Queen City*, 124 F.3d at 436 (citing *TV Commc'ns Network, Inc. v. Turner Network Television*, 964 F.2d 1022, 1025 (10th Cir. 1992)). The New Jersey Antitrust Act has incorporated the "reasonable interchangeability" standard applicable to federal antitrust claims by virtue of statute. *See* N.J. Stat. Ann. § 56:9-18 (the New Jersey Antitrust Act "shall be construed in harmony with ruling judicial interpretations of comparable Federal antitrust statutes and to effectuate, insofar as practicable, a uniformity in the laws of those states which enact it").

In the Amended Complaint, First Priority defines the relevant market as the "manufacture of ambulances," explaining:

> 92. The relevant market for purposes of the antitrust claims in this case is the manufacture of ambulances. REV has, through acquisitions and the use of prolific explicit and de facto exclusive dealing agreements and demands, unreasonably injured competition in this relevant market. REV, in carrying out this wrongful conduct, has also attempted to monopolize and monopolized the market for ambulance manufacturers.

> 93. The relevant market for the manufacture of ambulances recognizes that ambulances are not reasonably interchangeable with other non-ambulance vehicles. Consumers do not believe or act as though non-ambulance vehicles can be used for the same purposes, taking into account their price, use and qualities.

94. Ambulances by federal regulation must include certain life safety equipment and meet certain safety standards that are not included in ordinary vehicles. Therefore, non-ambulance vehicles cannot be used as ambulances to transport patients. Ambulance manufacturers have equipment, knowledge and training that is unique to the manufacturing and regulatory requirements of the ambulance market and that is not possessed by manufacturers of other vehicles.

95. Ambulance vehicles are not interchangeable with other vehicles, and their function is unique. From the perspective of a consumer (both an ambulance dealer as well as the end-user of ambulances – municipalities, hospitals), such vehicles are not interchangeable with other vehicles. This latter observation means that there is a very low cross-elasticity of demand between ambulances and other vehicles. Further, ambulances do not have multiple uses. There simply is no reasonable interchangeability. No other products are capable of performing the same function as an ambulance.

96. The relevant economic market encompasses all economic substitutes for ambulances; there simply are not any. Again, ambulance vehicles are functionally distinct from other vehicles. Ambulance manufacturers offer a unique product and services associated therewith that other manufacturers cannot.

97. The complicated and demanding regulatory overlay permeating the ambulance market includes, but is not limited to, three federal regulatory organizations that enact ambulance "standards." KKK which is a federal ambulance standard, CAAS (Commission on Accreditation of Ambulance Standards) and NFPA (National Fire Protection Agency). KKK has been in effect since 1974 and are observed by state Health Departments, CAAS is fairly new and is still organizing, and NFPA is a Fire standard that started getting involved in Ambulance standards in the mid-2000's as more and more Fire Depts have gotten involved in emergency medical matters.

98. There is no substitute for an ambulance. Emergency patients cannot be transported by Fire Truck or other emergency vehicle.

(ECF No. 17 ¶¶ 92-98.)

First Priority alleges that the New Jersey ambulance market – from the consumer point-of-view – is broken down into several categories, including hospital-based EMS systems,

municipal based EMS systems, volunteer EMS systems, and commercial EMS providers. (*Id.* ¶ 100.) First Priority further alleges the "[r]elevant patterns of trade, including purchasing patterns" support its definition of the relevant market as consumers "do not consider other vehicles to be substitutes of ambulances," and from the "supply-side, manufacturers of other vehicles do not have the ability to easily start manufacturing and selling ambulances in the . . . market." (ECF No. 17 ¶¶ 101-02.)

REV contends the relevant market, as defined in the Amended Complaint, lacks all interchangeable economic substitutes because it does not include used ambulances. (ECF No. 18-1 at 16-17.) REV argues the proposed relevant market lacks all substitutes "by First Priority's own admission" (*Id.* at 16), as the Amended Complaint alleges that "approximately 84 ambulance companies in the state of New Jersey went out of business by the end of 2016" thereby "result[ing] in a flood of used ambulances in good condition being thrown onto the market, substantially impacting the ability to sell new ambulances." (ECF No. 17 ¶ 53.) Accordingly, REV argues that the proposed market must fail as a matter of law.

Here, the relevant market proposed in the Amended Complaint is insufficient as a matter of law. As conceded in the Amended Complaint, the relevant market does not encompass all reasonably interchangeable substitutes, nor does it adequately distinguish between the role of used versus new ambulances in the subject market. Accordingly, REV's Motion to Dismiss Counts Five, Six, Seven, Eight, and Nine of the Amended Complaint is **GRANTED** and Counts Five, Six, Seven, Eight, and Nine are **DISMISSED WITHOUT PREJUDICE**. Additionally, this Court determines that none of the four grounds precluding a Motion to Amend – undue delay, undue prejudice to the non-moving party, bad faith or dilatory motive, or futility of amendment – are present in this case, and therefore, First Priority's Motion for Leave to Amend

the Amended Complaint is **GRANTED**.[10]

### C. First Priority's Breach of Contract/Implied Covenant of Good Faith and Fair Dealing Claims

REV argues First Priority does not have a cognizable breach of contract claim or breach of implied covenant of good faith and fair dealing claim, Count Two, because the termination was in accordance with express contractual provisions. (ECF No. 18-1 at 21-24.) First Priority counters that dismissal of its breach of contract and implied covenant of good faith and fair dealing causes of action is unwarranted because it has pled oral modifications to the contract which created an understanding that, among other things, if First Priority performed adequately, REV would provide a reasonable time to cure before terminating the relationship. (ECF No. 25-1 at 27-34.)

REV contends its termination of the RR and SJC Agreements with First Priority conformed with the explicit contractual terms of the respective agreements. The RR Agreement's termination provision provides, in pertinent part:

> Notwithstanding anything contained in this Agreement to the contrary, Road Rescue shall have the right to terminate this Agreement upon occurrence of any of the following events:
>
> . . .
>
> (F) Failure to meet established sales and performance quota, as described in Section 2 – Items A & B[: ten vehicle sales per year,

---

[10] REV also contends that First Priority's Sherman Act causes of action – Counts Five and Eight – should be dismissed as the "alleged conduct is not actionable under the statute" as it fails to allege a "concerted action" between REV and another party. (ECF No. 18-1 at 17-21.) As this Court has already granted REV's Motion to Dismiss First Priority's antitrust claims for failure to adequately define a relevant market, it need not consider REV's additional claims concerning these causes of action. Nevertheless, in light of First Priority's allegations that First Priority has been harmed by REV's "exclusive dealing, recent mergers to take over competitors, and terminations of dealers for no legitimate reason," this Court finds that First Priority's antitrust claims have pled concerted actions between REV and third-parties so as to constitute actionable conduct pursuant to the applicable antitrust statutes. (ECF No. 17 ¶ 112.)

taking into account, among other things, present performance, potential performance, the competition and economic conditions that are affecting the market].

(G) Either party may terminate without cause by written notice to the other party giving at least thirty (3) days prior to the effective date specified by such notice. Road Rescue shall not be required to accept any order placed by Dealer for delivery after the effective date of termination. Once termination notice is given, Road Rescue may, at its option and before effective termination date, sign a new dealer for said territory.

(ECF No. 18-3, Ex. A at 8-9.)

Meanwhile, the SJC Agreement's termination provision provides, in pertinent part, that SJC may terminate the SJC Agreement on thirty days' notice for the breach of any contractual provision, which includes First Priority's obligation to meet or exceed sales criteria. (ECF No. 18-4, Ex. B at 8-10.) The sales criteria for the relevant time period were thirty-six McCoy Miller ambulances and ten Marque ambulances, and the SJC Agreement indicates that such goal is binding on the dealer absent any written amendment. (*Id.* at 6-10.) Accordingly, REV argues First Priority has failed to state a cognizable claim for breach of contract and breach of implied covenant of fair dealing and good faith as its termination comported with the applicable contractual termination provisions.

While First Priority does not dispute that it failed to sell the volume of ambulances required by the RR and SJC Agreements, it alleged that the agreements were orally modified to require, among other things, a notice of deficiency and a commensurate reasonable opportunity to cure, stating in pertinent part:

88. Furthermore, on multiple occasions, the parties' representatives discussed their mutual understanding that for their relationship to continue, [First Priority] would simply need to perform adequately, and, if [First Priority] was not performing adequately, [REV] would provide [First Priority] a reasonable time to cure the claimed deficiency before the relationship would be terminated. Similarly,

REV had an obligation to discuss and determine reasonable performance standards with [First Priority], the substance of which are the subject to the covenant of good faith and fair dealing, and the agreement. To the extent REV failed to reasonably discuss and agree upon such standards, REV violated the covenant of good faith and fair dealing, and the agreement. And, to the extent that REV, after execution of the agreement, agreed not to enforce or require such standards – but used an alleged failure to meet any such standards – REV violated the covenant of good faith and fair dealing, and the agreement.

(ECF No. 17 ¶ 88.)

First Priority contends that the parties made an oral modification via course of dealing and course of performance, and as such, this Court should not be guided exclusively by the terms in the contract. (ECF No. 25-1 at 28-31.) Indeed, the parties agree that such a modification is permitted – even where the contract explicitly requires a written amendment – pursuant to the laws of Indiana,[11] which the parties agree govern the RR Agreement, and Minnesota,[12] which the parties agree govern the SJC Agreement. Citing *Hamlin v. Steward*, 622 N.E.2d 535, 539 (Ind. App. 1993), REV contends that such a modification constitutes a new contract, which necessitates all the requisite elements of the formation of a new contract, and First Priority "does not allege that any benefit accrued to REV [] from the alleged modification or that First Priority incurred any detriment from the alleged modification." (ECF No. 29 at 14-15.)

REV's argument is unpersuasive. First Priority has adequately met its pleading obligation under the federal rules by alleging the parties' written contracts were modified by their course of dealings and oral agreements. Voluminous case law from both Indiana and Minnesota confirms that modifications to a contract may be implied by the subsequent conduct of the parties and need not be in writing, even where so stipulated in the contract. *Sees v. Bank One, Ind., N.A.*, 839

[11] Ind. Code 26-1-2-202 (Final written expression; parol or extrinsic evidence).

[12] Minn. Stat. § 336.2-202 (Final written expression; parol or extrinsic evidence).

N.E.2d 154, 161 (Ind. 2005); *Larson v. Hill's & Refrig. Of Bemidji, Inc.*, 400 N.W.2d 777, 781 (Minn. Ct. App. 1987). As such, First Priority's failure to explicitly allege the benefit accrued to REV and the legal detriment incurred by it as consideration for the modification is not fatal to its claims. Accordingly, REV's Motion to Dismiss Count Two is **DENIED**.

### D. First Priority's Promissory Estoppel Claim

REV argues this Court should dismiss First Priority's promissory estoppel claim because it is a quasi-contract claim which is "unavailable" where an express contract covers the subject matter of the dispute. (ECF No. 18-1 at 24-25.) Relying on *Lano Equip., Inc. v. Clark Equip. Co.*, 399 N.W.2d 694, 698 (Minn. Ct. App. 1987), First Priority contends that its promissory estoppel claim is adequately pled and its reliance on REV's representations caused it substantial and definite harm. (ECF No. 25-1 at 34-36.)

Here, First Priority alleges REV "promised" it a "reasonable time to cure" any "claimed deficiency before the relationship would be terminated," and that First Priority relied upon the representation to its detriment. (ECF No. 17 ¶¶ 161-64.) However, under the laws of Minnesota and Indiana,[13] the application of the doctrine of promissory estoppel is an equitable quasi-contract remedy available only when there is not an adequate remedy at contract law. *See Olson v. Synergistic Techs. Bus. Sys., Inc.*, 628 N.W.2d 142, 149 (Minn. 2001); *see also Indiana Bureau of Motor Vehicles v. Ash, Inc.*, 895 N.E.2d 359, 367 (Ind. Ct. App. 2008) (holding that

---

[13] While the parties agree that Minnesota and Indiana law apply to the SJC and RR Agreements, respectively, REV invokes New Jersey law in contending that First Priority's promissory estoppel claim should be dismissed. (ECF No. 18 at 24-25.) Any disagreement between the parties as to the controlling law is immaterial, as dismissal of the promissory estoppel claim is also warranted under New Jersey law. *See Freightmaster USA, LLC v. Fedex, Inc.*, No. 14-3229, 2015 WL 1472665, at *6 (D.N.J. Mar. 31, 2015) (holding that a promissory estoppel claim is a quasi-contract claim that is unavailable where there is a remedy at contract law); *see also Suburban Trans. Serv., Inc. v. Beach Holdings, LLC, Inc.*, 716 F.2d 220, 226-27 (3d Cir. 1983) (same).

promissory estoppel is a quasi-contractual remedy permitting recovery in the absence of a contract to prevent unjust enrichment). Furthermore, the decision in *Lano* – the primary authority relied upon by First Priority – does not stand for the proposition that promissory estoppel may be applied alongside a breach of contract claim, but only that a party is precluded from denying the existence of a long term contractual relationship where a contract had expired but was informally renewed. *Lano*, 399 N.W.2d at 698-99. Indeed, the decision in *Lano* did not deal with the application of promissory estoppel whatsoever. Accordingly, REV's Motion to Dismiss Count Ten is **GRANTED** and Count Ten is **DISMISSED WITHOUT PREJUDICE**.

## IV.    CONCLUSION

For the reasons set forth above, REV's Motion to Dismiss is **GRANTED** with respect to Counts One, Five, Six, Seven, Eight, Nine, and Ten and **DENIED** with respect to Count Two, and First Priority's Cross-Motion for Leave to Amend the Amended Complaint is **GRANTED**.


Date: July 30, 2019                                     */s/ Brian R. Martinotti*
                                                        **HON. BRIAN R. MARTINOTTI**
                                                        **UNITED STATES DISTRICT JUDGE**